# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

HANNAH WEAVER,                    Case No. 17-32042
                                       Chapter 7
                                       Hon. Joel D. Applebaum

_____ Debtor. _____/

## OPINION GRANTING DEBTOR'S MOTION TO ENFORCE DISCHARGE INJUNCTION, GRANTING COMPENSATORY AND PUNITIVE DAMAGES, AND IMPOSING CONTEMPT SANCTIONS FOR VIOLATION OF COURT ORDER

The matter before the Court is Hannah Weaver's Motion to Enforce Order of Discharge. For the reasons set forth below, the Motion is GRANTED. Debtor is awarded compensatory and punitive damages against the Belmont Franklin Group, LLC and Shandra Champagne, jointly and severally, as outlined in this Opinion.

## I.

### INTRODUCTION

The discharge is a permanent order prohibiting creditors of a debtor from taking any form of collection action on discharged debts, including legal action and communications with the debtor, such as telephone calls, letters, and personal contacts. The purpose of the bankruptcy discharge is to provide "a procedure by which certain insolvent debtors can reorder their affairs, make peace with their

creditors, and enjoy 'a new opportunity in life with a clear field for future effort, *unhampered by the pressure and discouragement of preexisting debt*.'" *Grogan v. Garner*, 498 U.S. 279, 296 (1991) (emphasis added, internal citation omitted). The greatest benefit of obtaining a discharge of debts is the ability to escape from the financial and emotional burdens of previous financial entanglements. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)("One of the primary purposes of the Bankruptcy Act is to 'relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes'"). Given the importance of the discharge to a debtor and its seminal role in bankruptcy proceedings, allegations of violations of the discharge injunction are a very serious matter.

II.

FACTUAL BACKGROUND

Debtor filed her personal chapter 7 bankruptcy on September 6, 2017. Debtor's Schedule F listed an unsecured debt to Belmont Franklin Group, LLC ("Belmont") in the amount of $57,294 resulting from an unsecured personal guarantee on a business loan made to Debtor's business, Hannah Berry Hair Co., LLC. Belmont was listed on the matrix and received notice of the bankruptcy filing. On September 18, 2017, Debtor dissolved Hannah Berry Hair Co., LLC. On December 23, 2017, Debtor received her chapter 7 discharge. The discharge order

2

resulted in the discharge of Debtor's debt to Belmont.

Either Belmont or Shandra Champagne ("Champagne") who, according to Belmont's website, is Belmont's chief executive officer, made the following *post-discharge* contacts with Debtor regarding her discharged debt to Belmont. The contacts are numbered, below. Debtor's responses to those contacts are set forth in italics as they occurred:

1. On January 11, 2018, Shandra Champagne emailed Debtor demanding payment of Debtor's debt to Belmont. (Ex. C). The email stated:

   > I have been trying to work with you. I must [sic] a SOLID payment arrangement that we can stick too [sic] and will not NSF by the end of tomorrow.

   > The legal department is going to start freezing accounts (Putting [sic] the CPJ into effect) if I do not send them a payment arrangement that will not NSF.

   This email appears to have been sent from Champagne's personal email account and using her personal email address.

2-4. On January 22, 2018, Champagne sent <u>three</u> texts to Debtor demanding payment on a debt in the amount of $56,390. (Ex. D). It is unclear whether the cell phone used to send these texts is Champagne's personal cell phone or a cell phone issued to Champagne by Belmont.

   *On January 22, 2018, Debtor's counsel mailed Belmont a letter reminding Belmont that the debt had been discharged and that their contact with Debtor was in violation of the bankruptcy laws. Debtor's counsel enclosed a copy of the discharge order with this letter. (Ex. E).*

5. On February 13, 2019, Debtor received a collection notice from Southwest Recovery Services seeking recovery of Debtor's debt to Belmont (now listed in the amount of $82,000). (Ex. F). The letter states that, "Our office has been retained by [Belmont] to collect on an overdue account."

*On February 25, 2019, Debtor's counsel mailed Southwest Recovery a letter with a copy to Belmont notifying them that the debt had been discharged and enclosing a copy of the Discharge Order. (Ex. G). The letter also stated that "any further attempt at collecting this debt by you or your client will result in the reopening of her bankruptcy case to file a motion against your firm for violation of her discharge."*

6-7.    On April 3, 2019, Belmont sent Debtor <u>two</u> emails. The first was addressed to "FBI Headquarters White-Collar Crime Division" yet it was just sent to Debtor (with an amount due listed at over $91,000). This email, which appears to be an attempt to coerce Debtor to pay with the threat of federal prosecution, states, in part:

> The Belmont Franklin Group is advising you [the FBI] of this situation because **Hannah Berry Hair Co** has completely abandoned his [sic] responsibility of paying back this Merchant Cash Advance and The Belmont Franklin Group, LLC has reason to believe **Hannah Weaver** and his [sic] business **Hannah Berry Hair Co**, are investigated for potential Corporate Fraud. We have evidence that the business and owner falls into some or all of these categories: **corporate fraud: misrepresentations of financial condition, misuse of corporate property for personal gain and/or to obtain or avoid losing money, property or services or to secure a personal or business advantage.**
>
> If a response to this letter is **not received by 04/13/19** further **Legal Action will proceed.** (emphasis in original)

The second email was entitled "10 Day Notice to File Lawsuit" threatening legal action for non-payment. (Ex. H). That email states, in part:

> I am writing to inform you that I intend to pursue legal action in the form of a lawsuit against **YOU, personal guarantor** and **HANNAH BERRY HAIR CO, company.**
>
> I have repeatedly attempted to request payments via calls, texts, emails, letters and my last attempt was through the attorney's office. However, to date I have still not received the payments that are owed to me.
>
> This leaves The Belmont Franklin Group no other choice than to

pursue legal action. . . .

If you do not respond, you will be served with a judgment on you and your company. (emphasis in original)

8-9. In the fall of 2019, Debtor received <u>two</u> Facebook messages from Mitchell Levy, Director-Legal Affairs at Belmont. Debtor testified at an April 5, 2023 hearing[1] that, in those messages, Mitchell Levy told her that:

> he was going to call the news; he was going to call whoever he can call to let people know I was a fraud and I was a con artist and took money that was owed to them and I haven't repaid. I was emotional. I was kinda scared to go out of the house because I did not know what these people would do to me if they were looking for me, watching me. It was extremely intimidating, very emotional. (Dkt. No. 37, Recording of Hearing held on April 5, 2023, Testimony at 26:29, hereinafter "Debtor's Testimony, Hearing at __").

10. On November 11, 2019, Debtor received an email from Mitchell Levy, Director-Legal Affairs at Belmont, threatening Debtor with a UCC lien. (Ex. I). The lengthy letter concluded:

> I am not interested in wasting your time or mine with empty statements and I suggest as strongly as possible that you govern your next decision quite wisely. If no reply is forthcoming from your or your legal representation within the next 24 hours, I will order legal proceedings initiated as expressed above.

11. On November 13, 2019, Shandra Champagne, Belmont's principal, sent an email to Debtor again demanding payment of the debt. (Ex. J).

*On November 13, 2019, Debtor's counsel emailed Mitchell Levy, Director-Legal Affairs for Belmont, indicating, again, that Debtor had filed a bankruptcy, enclosed another copy of the Discharge Order, and informed him that he and Belmont were in violation of the bankruptcy laws. (Ex. K). Debtor's counsel received a reply to this email from Mitchell Levy stating that Belmont was unaware that Debtor had filed for bankruptcy and had received no paperwork whatsoever but that "having received this information, this*

---

[1] An evidentiary hearing was held on this motion on April 5, 2023.

*matter shall be closed as required." (Ex. L).*

12.   Notwithstanding the response of Belmont's Director - Legal Affairs that the matter would be closed, on July 22, 2022, Debtor received a collection notice from IC System regarding collection of a debt in the amount of $67,025 owed by Debtor to Belmont. (Ex. M).

*On September 12, 2022, Debtor's counsel sent a letter to IC System informing them of Debtor's discharge and copying Belmont on the correspondence. (It appears that Debtor may have called IC System after receiving the letter to tell them the debt had been discharged in bankruptcy because Debtor's counsel's letter states, "[y]our company was informed by Ms. Weaver that she has dissolved the company and filed for personal bankruptcy.")(Ex. N). In response, on September 17, 2022, Debtor's counsel received a letter from IC System stating that it would no longer pursue collection and is returning the account to Belmont. (Ex. O).[2]*

13. On August 15, 2022, Nekxum Group, another collection agency retained by Belmont, contacted Debtor by phone about repaying her debt to Belmont. (Ex. P).

14. On August 23, 2022, Nekxum again contacted Debtor by phone about repaying her debt to Belmont. (Ex. P).

*Debtor told Nekxum Group that she the debt was discharged in her bankruptcy.*

15. On November 14, 2022, Shandra Champagne sent a Facebook Messenger message to Debtor which reads, "YOU STILL OWE ME MONEY – I WILL GET IT BACK!" (Ex. Q).

16-18. On December 6, 2022, Anthony Stephens, collections manager of Ilex Asset Recovery, sent Debtor a text telling her he had sent two emails regarding her debt to Belmont and asking her to call him. (This constitutes <u>three</u> separate contacts).

19-21. On December 7, 2022, Anthony Stephens of Ilex contacted Debtor <u>three</u> times.  First, Stephens contacted Debtor by text. In that text, Ilex sought repayment of Debtor's debt to Belmont.  That text stated (transcribed exactly

---

[2] It appears that Debtor's counsel's response to IC System occurred after the debt had also been referred to Nekxum Group.

as written):

> Hannah
>
> Good morning
> I sent several emails and no response. you can not [sic] get made once your account is levy, or seize for the capture of funds. you did take the funds. now that i m asking about repayment, I don't hear from you. you can not [sic] get mad about the outcome.
> pick up the phone and let me know what going on. It cost you nothing for an explanation for why your [sic] not repaying Belmont.

Second, the "Litigation Team" emailed Debtor asking her to set up a payment plan and threatening legal action. Third, Stephens sent Debtor an email threatening to take her to court, file a class action lawsuit, seek criminal prosecution, and expose her as a deadbeat in the newspapers and on television. The last email stated (transcribed exactly as written):

> Hannah believe me when I tell you. I will be having you in front a judge asking why, you just could pick up the phone. then i will get all the mcas and people you owe money to and set up a class action lawsuit. then i will go to your county DA and see if we can get an attempt to defraud. you took these MCAs knowing you're not going to pay them back. which turns into wire fraud because you took this money under false pretenses. (a federal crime) I am good at what I do. And to top it off. local news and papers will know you as a deadbeat and a thief. this a serious possibility. yes, I will go there. the debt is owed, I will reduce the amount close to half or more. call me, it's just to talk and let me know whats [sic] going on. Anthony 305-912-1567

22. On December 13, 2022, Anthony Stephens of Ilex contacted Debtor again, this time by text, with the same threatening language used in the email set forth above. (Ex. R).

23-24. On December 14, 2022, Anthony Stephens of Ilex contacted Debtor twice by text seeking repayment of her debt to Belmont. (Ex. R). Remarkably, in his second text, Stephens attached Debtor's public records filings which included Debtor's bankruptcy record setting forth:

Bankruptcy Records
09/06/2017
Discharge Date: 12/12/2017

25. On or about December 19, 2022, Anthony Stephens of Ilex again texted Debtor. (Ex. R). That text stated (transcribed exactly as written, parenthetical added for clarity):

> unfortunately, I have not received anything regarding you dissolving your company. now I have to send out legal notices going out to your cash app and online and physical banks as well as use your social for any employment wages that can be garnish unit l [until] the balance is paid in full

26. Debtor testified at the hearing that Anthony Stephens also reached her by phone. They had an extremely short conversation. (Debtor's testimony, Hearing at 39.17)

27. Debtor testified that Stephens again texted her sometime after February 10, 2023, after her attorney had filed this motion. (Debtor's testimony, Hearing at 40.20)

On February 10, 2023, Debtor filed this Motion to Enforce Order of Discharge seeking: (1) an order to enjoin the Belmont Franklin Group LLC, its officers, employees and agents from continuing to attempt to collect a debt discharged by Debtor in her 2017 chapter 7 bankruptcy; and (2) damages for Belmont's repeated violations of the discharge injunction. Debtor states that she has suffered considerably as a result of Belmont's debt collection efforts made through numerous texts, emails, phone calls, voicemails and social media posts by Belmont, its principal, Shandra Champagne, and its collection agents. Specifically, Debtor seeks compensation from Belmont in the amount of $2,500 per violation plus attorneys'

8

fees in the amount of $3,000 for the time spent on this matter.[3]

On March 9, 2023, Debtor submitted an order on a Certificate of Non-Response. Rather than signing the order, this Court set this matter for a 'show cause' hearing as to why Belmont should not be sanctioned for violating the discharge injunction and to give Belmont and Champagne an opportunity to appear and be heard on whether damages and/or sanctions should be awarded and, if so, the appropriate amount. The show cause hearing was scheduled for April 5, 2023. The Show Cause Order stated, in part:

> **ORDER TO SHOW CAUSE WHY BELMONT FRANKLIN GROUP SHOULD NOT BE SANCTIONED FOR VIOLATING THE DISCHARGE INJUNCTION**
>
> Upon the Motion of the Debtor to enforce the discharge injunction, and the Court being otherwise advised in the premises, NOW, THEREFORE,
>
> IT IS HEREBY ORDERED that Belmont Franklin Group, LLC and any of its principals, including but not limited to Shandra Champagne, are hereby ordered to cease any and all contact with Hannah Weaver either personally or through any of her current or former businesses.
>
> IT IS FURTHER ORDERED that a hearing will be held on April 5, 2023 at 11:00 a.m. (ET) in person in the United States Bankruptcy Court for the Eastern District of Michigan, 226 West Second Street, Flint, Michigan 48502 at which hearing Belmont Franklin Group, LLC and Shandra Champagne shall show cause why they should not be sanctioned, including an award of attorney's fees, for their alleged violations of the discharge injunction.

An in-person hearing was held on this matter on April 5, 2023 at the United

---

[3] Using this formula, Debtor is seeking $70,500.

States Bankruptcy Court for the Eastern District of Michigan located in Flint, Michigan. Debtor and her counsel were in attendance. No one appeared on behalf of Belmont Franklin Group or Shandra Champagne. At that hearing, Debtor was sworn as a witness and testified as to the facts of this matter. During her testimony, Debtor explained the toll these collections efforts had on her psychological and emotional well-being:

> I was scared because they were continuously sending me all different types of things. (Debtor's testimony, Hearing at 24:17)

> \*     \*     \*

> Mitchell Levy, from Belmont, Facebook Messaged that "he was going to call the news, he was going to call whoever he can call to let people know I was a fraud and I was a con artist and took money that was owed to them and I haven't repaid. I was emotional. I was actually kinda scared to go out of the house because I did not know what these people would do to me if they were looking, watching me. It was extremely intimidating, very emotional." (Debtor's testimony, Hearing at 26:20).

Shortly thereafter, Debtor received the letter referenced as Exhibit L from Mitchell Levy, Director – Legal Affairs.

> I was honestly ashamed to even file bankruptcy . . . I was kinda beating myself up even about it. So when I received the letter after discharge I started to feel a little depressed in a sense and saying that I still owed them money that I knew I wouldn't be able to pay back. It just made me feel. . . I had anxiety, like anxious, my thoughts were scrambled. I did not know what to do. (Debtor's testimony, Hearing at 42:08)

> \*     \*     \*

> I still, I'm feeling anxiety, I'm feeling like why are these people still reaching out to me, honestly I went into depression, just not

understanding why are these people harassing me about something that has already been discharged. (Debtor's testimony, Hearing at 43:02)

*  *  *

It made me feel extremely horrible . . basically they wanted to defame my character … I feel extremely horrible." (Debtor's testimony, Hearing at 44:00)

Debtor further testified that it was very emotional to relive this embarrassing part of her life. She would read a collections letter, and her chest would feel tight.  She just wanted to be left alone. It was sad and depressing. (Debtor's testimony, Hearing at 46:28)

At the conclusion of the April 5, 2023 hearing, the Court took the matter under advisement.

III.

ANALYSIS

With certain exceptions, upon receiving a bankruptcy discharge under 11 U.S.C. § 727(a), a debtor is relieved from payment of all pre-petition debts.  Section 524(a)(2) of the Bankruptcy Code enjoins a creditor from undertaking *any* action to collect or recover on any discharged debts.

A. Civil Contempt

Bankruptcy courts enforce § 524 through civil contempt proceedings. *Pertuso v. Ford Motor Credit Co.,* 233 F.3d 417, 421-422 (6th Cir. 2000)("[A] debtor's only recourse for violation of the discharge injunction is to request that the offending

11

party be held in contempt of court."). Bankruptcy courts have civil contempt powers which "flow from Bankruptcy Code § 105(a) and the inherent power of a court to enforce compliance with its lawful orders." *In re Walker*, 257 B.R. 493, 496 (Bankr. N.D. Ohio 2001) (citations omitted).

The requirements for finding a party in contempt for violating the discharge injunction were updated in the Supreme Court's decision in *Taggart v. Lorensen,* 139 S.Ct. 1795 (2019). Under *Taggart*, a court may find a party in civil contempt if: (1) the party violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts; (2) the party did so with knowledge of the court's order; and (3) there is no fair ground of doubt as to whether the order barred the party's conduct — i.e., no objectively reasonable basis for concluding that the party's conduct might be lawful. *Id*. at 1799; *In re City of Detroit*, 614 B.R. 255, 265 (Bankr. E.D. Mich. 2020); *Orlandi v. Leavitt Family Ltd. P'ship (In re Orlandi)*, 612 B.R. 372, 382 (6th Cir. BAP 2020). The moving party must prove at least the first two elements by clear and convincing evidence. *City of Detroit,* 614 B.R. at 266.

In this case, the evidence is clear and unrebutted that Belmont and Shandra Champagne violated a definite and specific order of the Court, specifically the discharge order. Their emails, texts, Facebook messages, phone calls, voicemails, and several referrals of Debtor's debt to collection agencies were all actions to

12

collect a discharged debt in violation of the discharge order. In addition, it is abundantly clear that Belmont and its principal, Shandra Champagne, had knowledge of this Court's order. After receiving the discharge order at the time discharge was granted, Debtor's counsel provided Belmont and Shandra Champagne with additional copies of the order on several occasions. (Exs. E, G, L, O). Belmont's Legal Affairs Director confirmed receiving a copy of the discharge order and, on behalf of Belmont, agreed to halt collection on the debt, which it did not do. (Ex. L). Moreover, there can be no fair ground of doubt as to whether the discharge order barred Belmont's and Champagne's conduct. Belmont's Legal Affairs Director admitted in his email that he understood that no collection action should occur stating that, "having received this information [the discharge order], this matter shall be closed as required." Based on these facts, this Court finds that Belmont and Champagne are in civil contempt of this Court's discharge order.

B. Damages for Civil Contempt

Having determined that Belmont and Shandra Champagne are in civil contempt for their violations of the discharge order, the Court is tasked with determining the appropriate amount of damages, if any, to impose on Belmont and Champagne for these violations. The Sixth Circuit has approved the award of compensatory damages and mild punitive damages in cases involving the violation of the discharge injunction. *In re Berry*, 2022 WL 4115752, *18 (6th Cir. BAP,

September 9, 2022); *In re John Richards Home Bldg. Co.*, 552 F. Appx. 401, 412 (6th Cir. 2013) (court limits punitive damages to "mild" damages but declines to draw a bright line as to what constitutes a "serious" sanction). This Court has "broad discretion ... in selecting an appropriate sanction" for a violation of the discharge injunction," *Badovick v. Greenspan (In re Greenspan)*, 464 B.R. 61, No. 10-8019, 2011 WL 310703, at *5 (6th Cir. BAP, Feb. 2, 2021), which will not be set aside absent an abuse of discretion. *In re Bagsby,* 40 F.4th 740, 746 (6th Cir. 2022).

    1. <u>Compensatory Damages for Attorneys' Fees</u>

If a bankruptcy court finds a creditor in civil contempt for violating the discharge injunction, that court has the discretion to award the debtor actual compensatory damages, including attorney fees and costs. *Miller v. Chateau Communities, Inc. (In re Miller),* 282 F.3d 874, 875 (6th Cir. 2002). In this case, Debtor is entitled to recover reasonable attorney fees for her counsel's work responding to Belmont's and Champagne's innumerable collection efforts against the Debtor, including all informal efforts to address this matter, and for costs incurred in bringing and litigating this motion. Because this Court may only grant reasonable attorneys' fees and costs, Debtor's counsel must submit an itemized list of her fees and costs for this Court's review. Debtor's counsel may submit a fee statement, for this Court's review, within 14 days of the entry of the order.

    2. <u>Compensatory Damages for Emotional Distress</u>

There is a disagreement among courts across the circuits on whether damages for emotional distress may be awarded in cases involving the violation of the discharge injunction. While the Sixth Circuit has not yet weighed in on the matter, *In re Barry*, 2022 WL 4115752, *19 *citing In re Cantrell*, 605 B.R. 841, 858 n. 8 (Bankr. W.D. Mich. 2019), lower courts within the Sixth Circuit have awarded damages for emotional distress in cases involving a violation of the discharge injunction. *See In re Perviz*, 302 B.R. 357, 371 (Bankr. N.D. Ohio 2003)(emotional distress damages awarded); *In re Jones*, 603 B.R. 325, 331-332, 335 (Bankr. E.D. Ky. 2019) (emotional distress damages awarded based solely on Debtor's testimony regarding how creditor's actions post-discharge caused her "tremendous stress and embarrassment . . . as well as the erosion of her familial relationships."). Courts in other circuits have similarly awarded damages for emotional distress for violations of the discharge injunction. *Nibbelink v. Wells Fargo Bank, N.A. (In re Nibbelink)*, 403 B.R. 113 (Bankr. M.D. Fla. 2009) (emotional distress damages for assessing invalid fees during chapter 13 case and falsely reporting mortgage as delinquent on credit report*); Gervin v. Cadles of Grassy Meadows II, L.L.C. (In re Gervin)*, 337 B.R. 854 (Bankr. W.D. Tex. 2005); *Atkins v. United States (In re Atkins)*, 279 B.R. 639 (Bankr. N.D.N.Y. 2002*). But see, In re Walter*, 868 F.2d 665, 670 (4th Cir. 1989)("no authority is offered to support the proposition that emotional distress is an appropriate item of damages for civil contempt"). This Court agrees with those

courts that hold an award of damages for emotional distress is appropriate for violations of the discharge injunction.

Having concluded that Debtor may recover damages for emotional distress resulting from the violation of the discharge injunction, there appears to be a further split in authority as to the amount or type of *proof of injury* required to support such an award.  One line of cases requires corroborating evidence to support allegations of emotional distress, as well as a close causal connection between the act and the emotional harm suffered.  *In re Barry*, 2022 WL 4115752, *19, *citing In re Cantrell*, 605 B.R. at 858 n. 8;[4] *McCool v. Beneficial (In re McCool)*, 446 B.R. 819, 824 (Bankr. N.D. Ohio 2013) abrogation on other grounds recognized by *In re Orlandi*, 612 B.R. 372 (6th Cir. BAP 2020).

A second line of cases, which this Court adopts, hold that the only hurdle to an award of emotional distress damages is proof that there is emotional harm that qualifies for an award of actual damages, and that there is a causal link between the violation of the discharge injunction and the resulting injury.  *Perviz*, 302 B.R. at 371. These courts have allowed compensatory damages for emotional distress,

---

[4] While *Cantrell* was a case involving a violation of the discharge injunction, the *Cantrell* court cited cases involving the violation of the automatic stay and those cases appear to require "relatively specific and certain" proof of damages.  *Cantrell*, 605 B.R. at 858 n 8, *citing McCool v. Beneficial (In re McCool)*, 446 B.R. 819, 824 (Bankr. N.D. Ohio 2013) abrogation recognized by *In re Orlandi*, 612 B.R. 372 (6th Cir. BAP 2020).

absent any demonstrable out-of-pocket expenses, if two conditions are met: (1) the debtor clearly suffered some appreciable emotional and/or psychological harm; and (2) the actions giving rise to the distress were severe in nature. *Id.* The two factors are balanced: the greater the extent of the creditor's violations, the less corroborating evidence will be needed to establish compensable emotional distress. *Id.* Conversely, the less severe the creditor's conduct, the more important corroborating evidence will become to sustain a request for compensatory damages for emotional/mental distress. *Id.* Corroborating evidence, such as actual medical testimony, is helpful but not always needed. *Id.*, *citing In re Poole*, 242 B.R. 104, 112 (Bankr. N.D. Ga. 1999). In other words, if the creditor's conduct is so egregious and extreme that one would normally expect emotional distress to occur, then a court may allow such damages without requiring additional evidence if it finds the debtor's testimony to be credible.[5]

The cases also reflect a wide range of amounts awarded for compensatory damages for emotional distress for violations of the discharge injunction. *Compare,*

---

[5] In the *Perviz* case, over the course of nine months, the debtors received hundreds of phone calls, sometimes eight in one day, seeking to collect a discharged debt. Debtor wife answered many of those calls and, when she did so, she informed the caller of their impending bankruptcy, told the caller to contact her attorney and gave the caller her attorney's name and phone number. Debtors also received at least twelve different correspondences seeking collection of that same debt. The *Perviz* court stated, "given the large volume of calls made by [creditor] to collect on its debt, any reasonable person would have suffered from an appreciable amount of emotional/mental distress." *Perviz*, 302 B.R. at 372.

*In re Jones*, 603 B.R. 325, 331-332, 335 (Bankr. E.D. Ky. 2019) (court awarded Debtor $2,500 for emotional distress for violations of the discharge injunction based solely on Debtor's testimony regarding how creditor's actions caused her "tremendous stress and embarrassment . . . as well as the erosion of her familial relationships."); *Atkins v. U.S.A. (In re Atkins)*, 279 B.R. 639, 644 (Bankr. N.D.N.Y. 2002)(compensatory damages of $30,000 for emotional distress awarded for violation of the discharge injunction); *In re Poole*, 242 B.R. 104 (compensatory damages in the amount of $1,200 for emotional distress awarded for violation of the discharge injunction) *with In re Sorensen*, 2022 WL 2718871, *11-12 (Bankr. N.D. Ill., July 13 2022)("the injured party must show 'demonstrable emotional distress, not just point to circumstances . . . which might support an inference of such injury.'"); *In re Fauser*, 545 B.R. 907, 913 (Bankr. S.D. Tex. 2016)("[h]urt feelings, anger and frustration are part of life, and are not the types of emotional harm that could support an award of damages.")

In this case, Debtor credibly testified at the April 5, 2023 hearing that she suffered severe emotional distress. She testified that she was very ashamed to have had to file for bankruptcy in the first instance and that this sense of shame was exacerbated by the unrelenting debt collection efforts of Belmont, its officers and agents. Debtor testified that she was scared the debt collectors would come after her and she was, at one point at least, afraid to leave her house. She also testified that

she suffers severe anxiety and depression as result of these collections efforts, and that she feared that the harassment would never end. Belmont, Champagne and Belmont's debt collection agents contacted the Debtor twenty-seven times and failed to cease collection efforts, even after Belmont's own Director of Legal Affairs stated that Belmont understood that further collection actions were improper. The collection attempts occurred over the course of *six years* and continued for more than three years after Debtor's counsel was told by Belmont's Legal Affairs Director that such contacts would cease. Moreover, many of the contacts were *threatening* in nature, warning Debtor that she would be "exposed" in the media, that she would be prosecuted by the FBI, and that she would be brought before a judge to "explain herself." These contacts came by email, text, phone, and even through Facebook Messenger. Debtor tried repeatedly to convince Belmont and its agents to stop harassing her; her attorney wrote numerous letters and provided multiple copies of the Discharge Order to Belmont. Even when the collection agencies returned the Debtor's account to Belmont after being notified of the Discharge Order, Belmont simply transferred the account to another collection agency to begin the harassment all over again. Given the *unrelenting* collections efforts by Belmont, Champagne, and those representing Belmont, and their often-threatening nature, any reasonable person would have suffered from an appreciable amount of emotional/mental distress. Debtor has, therefore, provided a sufficient basis to warrant an award of

compensatory damages for emotional distress and, for these reasons, this Court awards Debtor $25,000 damages for emotional distress.

3. <u>Punitive Damages</u>

Unlike compensatory damages, punitive damages serve the same purpose as criminal penalties: to punish a party for their wrongful conduct and to deter further conduct of that same nature. *Perviz*, 302 B.R. at 372 *citing Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 307 fn. 9 (1986). "In situations where this policy function would be furthered, most court decisions have held, and this Court subscribes to the legal tenet that bankruptcy courts have the inherent power to punish parties for their contemptuous violation of the discharge injunction through the imposition of punitive damages." *Id.* However, punitive damages are typically imposed only when there is some sort of nefarious or otherwise malevolent conduct. *Stachura*, 477 U.S. at 307, fn. 9. Thus, in situations involving a violation of the discharge injunction, punitive damages have been limited to circumstances where there exists a complete and utter disrespect for the bankruptcy laws. *Perviz*, 302 B.R. at 372-373; *Barry*, 2022 WL 4115752 at *20 ("a bankruptcy court is authorized to impose a sanction for violations of the discharge order."); *In re Arnold*, 206 B.R. 560, 568 (Bankr. N.D. Ala. 1997) (punitive damages warranted where creditor acted willfully and maliciously in clear disregard and disrespect of the bankruptcy laws); *But cf. In re Borowski*, 216 B.R. 922, 925 (Bankr. E.D. Mich. 1998) (where parties

20

appeared to have been acting more out of ignorance than clear disregard and disrespect of bankruptcy laws, requisite malevolent intent to award punitive damages was lacking.)

In calibrating punitive damage awards, the Supreme Court has set forth three guideposts: (1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases. *BMW of North American, Inc. v. Gore*, 517 U.S. 559, 575 (1996).

a.    <u>Degree of Reprehensibility</u>

In this case, this Court finds that: (1) Belmont, Champagne and their agents contacted Debtor twenty seven times post-discharge in efforts to collect the discharged debt; (2) those contacts continued for more than six years; (3) those contacts continued for three years after Belmont's Director of Legal Affairs acknowledged that continued collection activity was improper; (4) Debtor's account was sent to collections agencies after Belmont had acknowledged the discharge; (5) upon each collection agency's discovery of the discharge (with the exception of Ilex), the account was returned to Belmont and Belmont immediately referred the account to a different collection agency; and (6) the attempts at collection contained threats of referral to the FBI, criminal prosecution, jail time, and exposure on

television, newspapers and other media of Debtor's failure to pay. This Court finds that the actions described in this Opinion rise to a level of reprehensibility that supports the assessment of punitive damages.

b. The Disparity Between Actual Or Potential Harm Suffered By The Plaintiff And The Punitive Damages Award

This Court has already ruled that Debtor's actual compensatory damages are valued at $25,000, plus attorneys fees. With that figure in mind, this Court will consider the amount of punitive damages to award in this case.

c. Civil Penalties Authorized or Imposed In Comparable Cases

The Sixth Circuit has held that bankruptcy courts do not have general statutory power to impose *serious* noncompensatory damages. *John Richards Homes Bldg. Co.*, 552 Fed. Appx. at 415. However, courts in the Sixth Circuit can impose "mild" noncompensatory damages. *Id.*; *Franklin Credit Mgmt Corp. v. Cook,* 551 B.R. 613, 625 (M.D. Tenn. 2016)(implying that the bankruptcy court's imposition of a $5,000 sanction on a corporate defendant was "mild"); *In re Biery*, 543 B.R. 267, 300(Bankr. E.D. Ky. 2015)(court authorized imposition of "mild" non-compensatory damages in upcoming class action lawsuit).

In *In re Berry*, a Sixth Circuit BAP opinion, the court sanctioned the creditor $1,000 for each communication which violated the discharge order and $100 per day for the creditor's failure to take effective corrective action in response to the

discharge order, its obligations under the Bankruptcy Code, and the objectively clear proof that the debt was discharged. The total amount of punitive damages totaled $10,300 which the court found was a mild sanction. *In re Berry*, 2022 WL 4115752, *20. *See e.g., In re Jones*, 603 B.R. 325, 335 (Bankr. E.D. Ky. 2019)(Debtor awarded mild non-compensatory damages of $7,500); *Perviz*, 302 B.R. at 374 ($8,000 in punitive damages awarded); *cf. In re John Richards Home Bldg. Co.*, 552 F. Appx. 401, 416 (6th Cir. 2013)(declining to draw a bright line for what constitutes a "serious" sanction because the $2.8 million awarded against an individual was "serious under any definition"); *In re Ridley*, 572 B.R. 352, 366 (Bankr. E.D. Okla. 2017)(court awarded $12,000 in punitive damages determined by sanctioning the bank $1,000 for each month that the bank failed to reflect the correct status of debtor's account post-discharge); *In re Mooney*, 340 B.R. 351, 362 (Bankr. E.D. Tex. 2006)(damage assessment against Green Tree in the amount of $40,000.00 is an appropriate award of punitive damages).[6]

---

[6] The *Mooney* court described the violations of the discharge injunction as follows:

> Green Tree's post-discharge threats to "go public," which were intended to intimidate the Debtor into complying with its demands, eroded the safeguards against harassment which the discharge injunction represents and undermined the fresh start to which the Debtor was entitled. Green Tree further violated the discharge injunction by its filing of a post-discharge lawsuit seeking a recovery of a personal judgment against the Debtor, thereby triggering the necessity for the Debtor to engage legal representation for protection, thereby further undermining the purposes of the discharge injunction.

This Court has already concluded that the Belmont and Champagne evinced a complete and malicious disregard of the Court's discharge order. Debtor received her discharge on December 23, 2017. Belmont was on Debtor's matrix and was served with the notice of the bankruptcy discharge. Despite this notice, Belmont's and Champagne's first four attempts at collection began on January 11, 2018. On January 22, 2018, Debtor's counsel mailed Belmont a letter reminding Belmont that the debt had been discharged, that their contact with the Debtor was in violation of the discharge injunction and enclosing a copy of the discharge order. Despite this second, more personal notice of Debtor's discharge, collection efforts continued. After seven more collection efforts, and two more letters from Debtor's counsel advising Belmont that it was in violation of the bankruptcy laws, Belmont's Director of Legal Affairs acknowledged that the Debtor's debt had been discharged and

_____

Yet Green Tree did not stop there. Its actions went beyond mere threats and even beyond the illegitimate filing of a state court petition seeking an *in personam* judgment. Even after the Debtor's attorney filed the motion to reopen the bankruptcy case, thereby again informing Green Tree of its ongoing violations of the discharge injunction, Green Tree willfully plowed ahead with its strategy, continuing to contact the Debtor at her place of employment and purposefully asserting her continued personal liability "even if the home burns." It supplemented those activities with the filing of its motion for summary judgment against the Debtor in state court which sought to render her personally liable for Green Tree attorney's fees.

*Id*. at 359. This Court finds that violations in this case equal or exceed in severity the violations identified in *Mooney*.

stated, "this matter shall be closed as required." Despite this assurance, Belmont, Champagne and their agents continued to attempt to collect Debtor's debt another sixteen times. For this reason, this Court will grant punitive damages in the amount of $500 per contact for the first four contacts that occurred post-discharge but prior to a personal reminder by Debtor's counsel of the Debtor's discharge along with another copy of the discharge order ($2,000); $1,000 per contact for the next seven contacts that occurred from the time Debtor's counsel again mailed Belmont a copy of the discharge order until Belmont acknowledged the discharge and agreed to halt collections ($7,000); and $1,500 per contact for the last 16 contacts that occurred after the Belmont agreed to halt collections but failed to do so ($24,000). This totals an award of $33,000 in punitive damages.

4. Contempt Sanctions for Failing to Appear at the April 5, 2023 Hearing in Contravention of This Court's March 10, 2023 Order to Show Cause

On February 10, 2023, Debtor filed this Motion to Enforce Order of Discharge in an effort to halt Belmont's and Champagne's collection efforts of Debtor's discharged debt. Neither Belmont nor Champagne filed a response to that motion. As a result, on March 9, 2023, Debtor properly submitted a proposed order on a Certificate of Non-Response. Rather than signing Debtor's proposed order, this Court entered its Order dated March 10, 2023 setting this matter for a show cause hearing as to why Belmont and/or Shandra Champagne should not be sanctioned for violating the discharge injunction. The show cause hearing was scheduled to be

heard on April 5, 2023. Debtor and her counsel were in attendance. No one appeared

on behalf of Belmont or Shandra Champagne.

The court in *S&S Innovations Corp.*, 2021 WL 849208, *3-4 (W.D. Mich.,

February 18, 2021) set forth the powers of a court to enforce its own orders:

> It is settled law that federal courts have the inherent authority to punish those who violate court orders. *See, e.g., Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994). "Courts independently must be vested with 'power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and ... to preserve themselves and their officers from the approach and insults of pollution.' " *Id.* (quoting *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L. Ed. 242 (1821)).

> *      *      *

> Civil contempt may be sufficient to effectively remediate the harm caused by his misconduct, vindicate the Court's orders, and provide the necessary incentive to obtain his future compliance with the Court's orders. The standards for civil contempt require a showing "by clear and convincing evidence that [the alleged contemnors] 'violated a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order.' " *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) (quoting *N.L.R.B. v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 590 (6th Cir. 1987)).

Based on the facts of this case, this Court finds that the standard for civil

contempt has been met and sanctions of $2,500 are, therefore, assessed against

Belmont and Shandra Champagne, jointly and severally, for failing to appear at the

April 5, 2023 show cause hearing in violation of this Court's March 10, 2023 Order.

## IV.

## CONCLUSION

In summary, this Court GRANTS Debtor the following relief:

- compensatory damages for emotional distress in the amount of $25,000;

- compensatory damages for Debtor's attorney's fees to be finalized upon submission of attorney's fee records for this Court's review as to reasonableness;

- punitive damages in the amount of $33,000, based on the number and timing of Belmont's and Champagne's various willful and malicious collection efforts; and

- contempt sanctions of $2,500 for Belmont's and Champagne's failure to appear at the April 5, 2023 show cause hearing in violation of this Court's show cause order.

All damages and sanctions are assessed against Belmont and Champagne, jointly and severally.

**Signed on May 10, 2023**



/s/ Joel D. Applebaum

**Joel D. Applebaum**
**United States Bankruptcy Judge**